Nina Doerflinger, et al. [1] v. Commissioner. Doerflinger v. Commissioner
Docket Nos. 78140-78142.
United States Tax Court
T.C. Memo 1961-185; 1961 Tax Ct. Memo LEXIS 166; 20 T.C.M. (CCH) 931; T.C.M. (RIA) 61185; June 21, 1961
*166 Held, respondent erred in determining that petitioners realized taxable long-term capital gains in certain transactions described in our Findings of Fact. Don O. Russell, Esq. 408 Olive St., St. Louis, Mo., and Joseph W. Schloemer, Esq., for the petitioners. James H. Martin, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in the income tax of petitioners for the year 1954 as follows: Docket
Number
Petitioner
Deficiency
78140
Nina Doerflinger
$ 3,737.45
78141
Olive Doerflinger
3,429.40
78142
Ro-Ches Realty, Invest-
ment & Building Co.
75,834.04 Certain stipulated concessions of issues have been made by the parties to Docket Nos. 78141 and 78142, which stipulations will be given effect in computations of taxes under Rule 50. The sole issue remaining in Docket Nos. 78140 and 78141 arises from respondent's adjustments explained in the statutory notices to Nina and Olive. The notice to Nina reads in part as follows: (a) On November 1, 1954, you exchanged capital stock of Ro-Ches Realty, Investment & Building Co. in return for a life interest in certain assets *167 of that corporation. It is held that you realized an unreported capital gain from this exchange computed as follows: Fair market value of life
interest received
$24,698.40
Basis of stock exchanged
3,333.33
Gain realized
$21,365.07
Limited to 50%
$10,682.54 Accordingly, your taxable income is increased in the amount of $10,682.54. The notice to Olive reads in part as follows: (a) On November 1, 1954, you exchanged capital stock of Ro-Ches Realty, Investment & Building Co. in return for a life interest in certain assets of that corporation. It is held that you realized an unreported long-term capital gain from this exchange computed as follows: Fair market value of life
interest received
$24,361.21
Basis of stock exchanged
3,333.33
Gain realized
$21,027.88
Limited to 50%
$10,513.94 Accordingly, your taxable income is increased in the amount of $10,513.94. The sole remaining issue in Docket No. 78142 is explained in the statutory notice as follows: (a) On November 1, 1954, you exchanged life interests in certain assets in return for shares of your capital stock. It is held that you realized a long-term capital gain from this exchange *168 in the amount of $277,594.40 computed as follows: Fair market value of
stock received
$294,227.36
Value of life interests
conveyed
16,632.96
Long-term capital gain
realized
$277,594.40
The issue, then, is whether petitioners realized taxable long-term capital gains upon the exchange of shares of stock in Ro-Ches Realty, Investment & Building Co., which the Commissioner has determined were owned by Nina and Olive Doerflinger, for life estates in certain assets owned by petitioner Ro-Ches Realty, Investment & Building Co. Findings of Fact Petitioners, Nina Doerflinger and Olive Doerflinger, individuals residing in St. Louis, Missouri, and petitioner Ro-Ches Realty, Investment & Building Co. (hereinafter referred to as Ro-Ches), a corporation organized under the laws of Missouri with principal place of business in St. Louis, each timely filed a Federal income tax return for the taxable year 1954 with the district director of internal revenue, St. Louis. Ro-Ches was organized in 1906 with an authorized capital stock of 100 shares of $100 par value stock. It engaged in the holding of real estate. On November 2, 1942, three brothers, Chester, Robert, and Lloyd *169 Doerflinger, each owned 33 1/3 shares of the stock of Ro-Ches. Chester was then president and Robert secretary of Ro-Ches. Nina and Olive were married to Chester and Robert, respectively. On the same date, the three brothers each owned 33 1/3 shares of Doerflinger Realty Company (hereinafter referred to as Realty), a Missouri corporation engaged in selling and building houses, real property appraisal, property management and rent collection, and the writing of hazard insurance. Realty is not involved in this proceeding. In the fall of 1942, the three brothers determined that they should make some provisions with respect to the companies in the event of the death of any of them. Pursuant to this decision, Chester consulted with and engaged Fred J. Hoffmeister, an attorney, to prepare such documents as might be necessary to give effect to the intent of the brothers. In this connection, Chester delivered the stock certificate books of Ro-Ches and Realty to the attorney. Hoffmeister prepared a trust agreement which he felt was responsive to the needs of the brothers as they had been presented to him. He also prepared certificates of stock in the two corporations for the number of shares *170 which each of the brothers owned, since such certificates had never been issued of record previously. Hoffmeister delivered the shares and the original and several copies of the trust agreement to Chester, retaining one copy for himself. The agreement, in which the brothers and their wives are referred to as "parties of the first part" and the brothers and Hoffmeister as "Trustees, parties of the second part," recited that: (1) The brothers are owners of 33 1/3 shares each of all of the capital stock of both Realty and Ro-Ches. (2) The brothers are "actively engaged in managing and conducting the affairs of such corporations, and are desirous of continuing the operation and ownership thereof in the families, and the survivors and survivor thereof." (3) The parties of the first part have agreed to create a trust under which "the stockholdings of each party hereto of the first part shall, on the death of such owner, vest" in the other parties of the first part as more fully specified, "and shall not become a part of the estate of said deceased party." The agreement then provided that: (1) Each of the brothers "have respectively endorsed, transferred and delivered" their stock *171 certificates in Realty and Ro-Ches to the trustees, who acknowledge receipt thereof "and agree to hold the same in accordance with the terms and conditions of" the trust instrument. (2) The trustees shall execute proxies to each of the brothers for the stock by each conveyed so long as each lives, and to execute new proxies in accordance with changes in the beneficial ownership of the stock. (3) The trustees shall collect all dividends paid by the corporations and pay the same to the grantors in the same proportion that the stock was contributed. (4) The trust shall continue during the lives of all the parties of the first part, and of the two named children of Lloyd. (5) Upon the death of any brother the stock he contributed shall be held for the benefit of his widow; if no widow survives, for the children of the decedent; if neither widow nor children survive decedent, then for the remaining parties of the first part; the procedure shall be followed until the last survivor becomes beneficial owner of all stock; the two minor children of Lloyd, although not parties to the agreement, shall succeed to the interest of their parents, and to the beneficial interests of the other *172 parties, if they shall so survive. (6) The parties understand in naming Hoffmeister as a trustee that one disinterested trustee shall always be "qualified and acting hereunder"; "[in] the event of the death, disability or refusal to act" of Hoffmeister, the adult beneficial interest holders shall appoint a successor disinterested trustee and failing agreement, petition for court appointment of one; the disinterested trustee "shall have possession and custody of the stock trusteed," shall disburse all dividends and other income, may rent a safe deposit box, and receive such annual fee as the parties shall vote. After the brothers examined the agreement, the original and several copies were signed on or about November 14, 1942, by the brothers and their wives as parties of the first part, and by the brothers as "Trustees, Parties of the Second Part." At approximately the same time that they signed the agreement, the brothers endorsed their respective shares of Realty and Ro-Ches in blank. The agreement and the endorsed certificates were placed in a safe in the office of Ro-Ches with the understanding that Chester was to return them to Hoffmeister. Each of the brothers or their *173 wives retained a copy of the agreement signed by all parties except Hoffmeister. Chester did not return the original agreement or the endorsed certificates to Hoffmeister, but he advised him that it had been signed by the brothers and their wives. At the time the instrument was signed, as well as during the entire period subsequent thereto, Hoffmeister was willing to accept the duties of trustee under the instrument. Robert died intestate on June 20, 1944. Upon the application of Olive alleging that Robert had no property or effects except a check for income tax refund, the Probate Court of the County of St. Louis, Missouri, issued its order refusing letters of administration on Robert's estate on January 13, 1945. Chester died intestate on October 30, 1945. Upon the application of Nina alleging that Chester had no property or effects except an automobile, the Probate Court of the City of St. Louis, Missouri, issued its order refusing letters of administration on Chester's estate on January 23, 1946. Following the deaths of their husbands, Nina and Olive received monthly payments from Ro-Ches. From January 1, 1954, to November 1, 1954, Nina received $2,500 from Ro-Ches and $2,500 *174 from Realty, all of which she reported on her income tax return as compensation. During the same period, Olive received $3,100 from Ro-Ches, which amount she reported as compensation. Olive received nothing from Realty during that period. Neither corporation paid any dividends. After the death of Chester and Robert, Lloyd was the manager of the corporations. He received annual salaries from both corporations but the amounts thereof are not shown in the record. Ro-Ches claimed deductions for the payments it made to Nina and Olive on its income tax returns. However, it now stipulates that $1,000 is a reasonable allowance for Olive and $900 is a reasonable allowance for Nina as salaries and that the Commissioner's disallowance of $2,100 for Olive and $1,600 for Nina as unreasonable should be sustained. No books of account were maintained under the trust agreement; no fiduciary income tax returns were filed on behalf of the trust; and the trustees never executed any proxies. Lloyd was president and managing officer of Ro-Ches in 1954. Prior to November 1954, Nina and Olive became concerned about their incomes should something untoward happen to Lloyd, and asked him if something could *175 be done to assure them incomes for the rest of their lives. Both Nina and Olive were over 65 years old at the close of 1954. In response to their request, Lloyd consulted Henry Ebenhoe, an attorney, showed him a copy of the trust agreement, and asked what arrangements could be made to assure the two widows their incomes. Ebenhoe advised Lloyd that if Ro-Ches conveyed to the widows life estates in rental properties which would produce income equal to that which they were then receiving, their incomes would be assured for life and the properties would revert to Ro-Ches upon their deaths. He prepared a form quitclaim deed which he forwarded to Lloyd to use in accomplishing the conveyance should such course be elected. Lloyd discussed the matter of the conveyance of life estates with Nina and Olive, showed them properties which he proposed would be transferred, and caused quitclaim deeds dated November 1, 1954, to be prepared and executed by Ro-Ches. He delivered the deeds to Nina and Olive who surrendered their signed copies of the trust instrument. The deeds were later recorded. These quitclaim deeds name Ro-Ches as party of the first part and Nina and Olive as parties of the second *176 part and read, in part, as follows: WITNESSETH, that the said party of the first part, for and in consideration of the sum of ONE DOLLAR, paid by the said party of the second part, the receipt of which is hereby acknowledged, does by these presents REMISE, RELEASE AND FOREVER QUITCLAIM unto the said party of the second part, for and during the term of her natural life only, the following described Real Estate, situated in the City of St. Louis and State of Missouri, to-wit: [Here follows the description of real estate, unnecessary to copy here.] Subsequently, Lloyd informed the accountant for Ro-Ches of the conveyance of the life estates to Nina and Olive and instructed him to make proper entries removing the properties from the books of the corporation. The accountant, for the purpose of establishing a balancing book entry, procured a new stock certificate book, prepared stock certificates dated November 1, 1954, in favor of Nina and Olive each for 33 1/3 shares of Ro-Ches stock, and requested Lloyd to procure the signatures of Nina and Olive on blank endorsements of the certificates dated November 1, 1954. The certificates were signed by Lloyd as president of Ro-Ches, but *177 were not signed by the secretary of the corporation. Lloyd presented Nina and Olive with the stock certificates, and requested that they endorse and return them, which they did. Ro-Ches made no payments to Nina or Olive after November 1, 1954. All that they have received since that date have been rentals from the real estate which was conveyed to them for their lifetime by Ro-Ches. In the taxable year 1954, each returned as income the two months' rentals which they received in that year from the real estate which was quitclaimed to them for their natural life by Ro-Ches in its quitclaim deeds executed November 1, 1954. Opinion BLACK, Judge: The sole issue is whether the petitioners realized taxable long-term capital gain upon the exchange of life interests in certain real property owned by Ro-Ches for shares of stock in Ro-Ches which respondent has determined were owned by Nina and Olive. Respondent has determined that Ro-Ches realized such gain measured by the excess of the fair market value of the stock which respondent determined that Ro-Ches received over the value of the life interests conveyed and that Nina and Olive realized gains measured by the excess of the fair market *178 value of the life estates received over their bases for the stock which respondent determined that they owned and exchanged. All of the petitioners contend that there was no such exchange, that there could be no such exchange, since the shares of stock were owned by a trust, and not by Nina and Olive. Respondent contends that no trust was ever established and that, therefore, Nina and Olive, as the heirs-at-law of their husbands, owned the stock which they conveyed to Ro-Ches. Respondent raises two principal contentions with regard to the validity of the trust. First, he contends that the facts and circumstances surrounding the event show that no trust was ever intended; next, he contends that the trust was ineffective for want of delivery of the corpus. We have set forth in our Findings of Fact the facts and circumstances surrounding the execution of the trust instrument. We must look now to the laws of Missouri to determine whether a valid trust was established. (C.A. 3, 1942). The rule of law applicable to the creation of an express trust under the laws of Missouri was set out in *179 at p. 33, as follows: In order to create a valid express trust inter vivos there must be a beneficiary, a trustee, a trust res so sufficiently described or capable of identification that the title thereto can pass to the trustee, and an actual delivery of the trust corpus, its character considered or a legal assignment of the same to the trustee actually conveying present title to the trustee; or retention of the corpus by the owner under circumstances which unequivocally discloses an intent to hold it for the use of another. , and authorities therein cited. In an instrument similar in many respects to the present trust agreement was in issue. In that case the court set forth the terms of the instrument at length and then stated, at : Manifestly it was the purpose of [the settlor] to provide for the future comfort and happiness of his wife and children and grandson * * *. His plan for the accomplishment of that purpose was adopted upon the advice of his attorney and after a through *180 consideration of the matter on his part. We must assume that he intended to do what the deed of trust shows he attempted to do. If that instrument, together with what was done in connection with it, created a valid trust, then it should be carried out in favor of the beneficiaries. * * * By the delivery of the deed of trust and the certificates covering the 4,000 shares of stock of S. D. Rossi, Incorporated, the settlor divested himself of the legal title to said shares of stock and vested it in the trustees, for the uses and purposes specified in the deed of trust. True, he reserved a beneficial interest in the trust property, the right to receive the net income derived therefrom during his lifetime. But this was one of the declared purposes of the trust, and did not affect its validity. * * * Moreover, his reservation of the net income of the trust property for life is strong evidence of his intention to transfer the title to the property, subject to that reservation. [Citations omitted.] It makes no difference that he received this income in the form of salary from S. D. Rossi, Incorporated, of which he was president and treasurer. * * * Nor was it inconsistent with a completely *181 executed trust for him to reserve the right to vote or direct the voting of said shares of stock and the right to hold such offices in the corporation as he desired. That was not a reservation of title, but of reasonable powers, coupled with a trust, for the protection of his equitable right to the net income of the trust property during his lifetime. * * * Applying the reasoning of the Davis case to the instrument involved in the instant case, we conclude that it clearly expressed an intent to create the trust which petitioners allege was established. Turning to the question of whether there was sufficient delivery of the trust res to establish a valid express inter vivos trust, we conclude that there was. As to the three brothers, who were the only parties owning the stock, the instrument was a declaration of trust rather than a deed of trust. Cf. , which involved an instrument markedly similar to that here in issue. In the Turner case, the settlors did not endorse their stock, but a provision of the instrument authorized the transfer on the corporate stock books. That provision and a recital of delivery and receipt *182 of the trust res in the instrument were held to effect sufficient delivery. In the instant case, endorsement of the stock certificates, coupled with the recital of delivery and receipt contained in the agreement accomplished the same result as in the Turner case. That the trust res does not appear to have been delivered to Hoffmeister as fourth trustee would not defeat establishment of a valid trust, for, as was said in the Turner case, "when there are two trustees, they hold as joint tenants so that title vests in the other even if one dies before the conveyance becomes effective." We conclude that an effective trust, of which the shares of Ro-Ches constituted the corpus, was established in November 1942. Nothing in the record establishes any termination or alteration of the trust prior to November 1, 1954. It follows that Nina and Olive could not have sold, nor Ro-Ches have purchased, those shares for life estates in real properties owned by Ro-Ches, because the trust, not Nina and Olive, owned the shares. Clearly, then, the transaction on which respondent has based his deficiency could not have legally occurred as respondent determined that it occurred. Up to the time the life *183 estates in certain real estate were conveyed to Nina and Olive they had received certain sums of money from the two corporations in which their deceased husbands had at one time owned stock but which stock they had placed in trust prior to their deaths. The sum of money which had been paid Nina and Olive had not been labeled "dividends"; in fact, no dividends had ever been paid by either corporation so far as the record shows. What Nina and Olive received from the corporations was labeled "compensation" and what Lloyd received was also labeled "compensation." As a matter of fact, he did render services to both corporations as their manager and directing head and we have no issue here concerning the amount of compensation which was paid to Lloyd. Originally, there was an issue raised by the pleadings as to the deductibility as salaries of the amount paid by Ro-Ches to Nina and Olive as compensation. However, that issue has been settled by agreement in the stipulation which has been filed. Of course, it goes without saying that the payments which were made by the corporations to Nina and Olive and labeled as compensation were taxable to them - they make no contention otherwise. In *184 their income tax returns filed in the taxable year they returned all the payments which were made to them by the corporations up to November 1, 1954. Thereafter, for the two remaining months in 1954 they returned as income the rentals which they received from the property which had been conveyed to them for life by quitclim deed by Ro-Ches. Respondent does not question that fact. Respondent has determined the deficiencies here involved on the theory that the life estates in the real property were conveyed to Nina and Olive in exchange for the transfer by them of 33 1/3 shares of Ro-Ches common stock. The evidence shows that what respondent has determined was not a fact. Nina and Olive owned no stock in Ro-Ches; they were beneficiaries of a trust which owned the stock of Ro-Ches. Nina and Olive were uneasy over the fact that if Lloyd, the only survivor of the Doerflinger brothers, should die, the income which they had been receiving from the corporations might be entirely shut off. So they contacted Lloyd about it. Lloyd then consulted his attorney and this attorney testified at the hearing of the instant case. He testified, in part, as follows: [It] seems to be * * * Mr. Lloyd *185 Doerflinger's desire to be sure that his two sisters-in-law would continue to get their income as they had in the past, * * * in the event some misfortune would fall on him, and he wanted to do that, and I recall asking him, "Why are you concerned about it;" And he said, "Well, they are, and I want to satisfy them." And then I thought, we discussed several things and I remember now, * * * that at first I thought of the possibility of conveying some real estate to them outright and after thinking about that we decided against that because it would defeat the purposes of the agreement [the trust agreement], and I think I was the one that suggested that, well, why not give them a life estate in various pieces of property, the income from which would be somewhat comparable to what their current income is, or what income they had been receiving. But I don't think that was at that conference. I think what happened was that somebody said, well, let's sleep over it, or let's think about it, or something of that sort, and possibly, according to my best recollection again, when I next saw Lloyd, * * * I believe I came up with the idea of saying I've given it some thought, and I think probably *186 the best way to satisfy everybody is just have the corporation give them a life estate in some of the properties. Then the witness went on to say that he gave Lloyd a form of quitclaim deed to use and that Lloyd himself had the quitclaim deeds prepared and executed in his office. These quitclaim deeds are in evidence in these proceedings. Lloyd testified at the hearing and among other things said: I think it was my sister-in-law Nina that questioned me as to what would happen to their income if something would happen to me, and about that time I consulted Mr. Ebenhoe [his attorney], and then we, after a number of discussions, decided that to assure my sisters-in-law of a livelihood out of the corporation, if I would be incapacitated, certain properties would be deeded to them in the form of a life estate, and upon their deaths the properties would revert back to the corporation. Lloyd then went on to describe how his attorney prepared the form of a quitclaim deed for life estates and that the actual quitclaim deeds were drawn in his office and executed there and delivered to Nina and Olive. Lloyd further testified as follows: Q. What was the consideration for the transfer? *187 A. None, other than relinquishing any further claims that my sisters-in-law might have from the income from the Ro-Ches Corporation. Q. Pursuant to the agreement? [Meaning the trust agreement of 1942.] A. That's right. Now, it is true that a few days after the quitclaim deeds were executed and delivered a new stock certificate book was procured, the old one could not be found, and a new stock certificate in Ro-Ches for 33 1/3 shares was issued to Nina and a similar stock certificate was issued to Olive and they, in turn, endorsed such certificates in blank and delivered them to Lloyd. This was done at the suggestion of the accountant of Ro-Ches, who had been notified of the transaction. At the hearing the accountant testified as follows: Q. Did you have any problems, then? A. Yes, I had an accounting problem. Lloyd Doerflinger informed me that these particular properties had been taken over by the girls through a, by lifetime interest, and it would be my job to take them off of the books of the corporation. Well, of course, I was confused. I didn't know, my first question was, well, what did the girls pay for the property? There seemed to be no consideration at all. *188 So in some way, either through Lloyd or myself, one or the other suggested that probably we should issue them capital stock and have them sign the stock back over so I would have some evidence of my entry on the books. Q. Your purpose was merely to make an offsetting entry on the books? A. That's correct. * * *
Q. When were those certificates made up in relation to, in point of time, to the delivery of the property to the widows? A. Well, shortly after the delivery. I think a day or so or two or three days, I didn't know how long, as I recall, I believe these were dated the same day the property was transferred. It was on the strength of these transactions as shown by the books and records that the Commissioner determined the deficiencies in question. He determined deficiencies against Nina and Olive on the theory that they each exchanged 33 1/3 shares of stock which they owned in Ro-Ches for quitclaim deeds to life estates in certain real estate. He determined a deficiency against Ro-Ches on the theory that it exchange life estates in real estate which it owned for 66 2/3 shares of its capital stock which respondent determined had a fair market value of $294,227.36. *189 On the strength of this determination of the fair market value of the stock, respondent determined that Ro-Ches had a long-term capital gain of $277,594.40 by reason of the alleged exchange. Doubtless there would be some basis for respondent's determination if, in fact, Nina and Olive exchanged 66 2/3 shares of stock in Ro-Ches to Ro-Ches for quitclaim deeds for life interests in certain real estate which Ro-Ches owned at that time. See (C.A. 5, 1935). But Nina and Olive owned no stock in Ro-Ches; there was no unissued stock in Ro-Ches. Its entire authorized capital stock of 100 shares was originally issued in equal amounts to the three Doerflinger brothers, Chester, Robert, and Lloyd. Chester and Robert were dead and their stock was part of the corpus of the trust as was also Lloyd's 33 1/3 shares. Certainly, Nina and Olive could not transfer to Ro-Ches the 33 1/3 shares which their husbands each owned at one time but which before their death they conveyed to a trust which we have already described. Ro-Ches had no unissued stock. Therefore, it seems to us that the purchase of a new stock book in 1954 at the instance of the accountant, *190 and the issuance of 33 1/3 shares of stock out of this new stock book to Nina and Olive each and the transfer back by them to Ro-Ches was of no effect except for book entry purpose. Of course, this latter part of the transaction made at the instance of the accountant gave color to the transactions on the books of Ro-Ches, as determined by respondent, but book entries, while evidentiary, are not at all conclusive. . The Supreme Court in that case ruled that the decision must be upon the actual facts, not what the books showed. In the instant case we are unable to sustain the Commissioner in the deficiencies which he has determined against Nina and Olive and against Ro-Ches on the grounds of alleged exchanges which he has determined that they made. The facts do not establish that any such exchanges were made as the Commissioner has determined. Therefore, we sustain petitioners on this issue. Of course, it goes without saying that the net rentals which Nina and Olive receive from the real estate which was conveyed to them will be taxable income to them from time to time as they receive such rentals. That fact we do not understand *191 that they dispute. In Docket No. 78140, the alleged exchange is the only issue. In Docket Nos. 78141 and 78142, there are other issues which have been settled by stipulation. Therefore, Decision will be entered for the petitioner in Docket No. 78140. Decisions will be entered under Rule 50 in Docket Nos. 78141 and 78142. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Olive Doerflinger, Docket No. 78141; and Ro-Ches Realty, Investment & Building Co., Docket No. 78142.↩